UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
SEAN MORELAND, JAMES FRANCISCHELLI,
WALTER TOMON, MICHAEL CAPERS,
MARCOS RODRIGUEZ, REGINALD DUGUE
and MICHAEL QUICK,                                                   Docket No.

                            Plaintiffs,              **COMPLAINT**

        - against -

MICROGENICS CORPORATION and THERMO                   Jury Trial Demanded
FISHER SCIENTIFIC, INC.,

                            Defendants.
--------------------------------------------------------------------X

        Plaintiffs above named, complaining of the Defendants by their attorneys, **HELD &
HINES, L.L.P.**, respectfully allege as follows, upon information and belief:

## JURISDICTION AND VENUE

        1.      This action is brought, *inter alia*, for negligence and violation of Plaintiffs' due
process rights afforded by the United States Constitution, in contravention of 42 U.S.C. §1983.

        2.      Jurisdiction of the District Court is appropriate pursuant to 28 U.S.C. §§1331 and
1343 in that this Complaint seeks to remedy violation of Plaintiffs' due process rights in
contravention of 42 U.S.C. §1983, and in that it is a diversity action and that the amount in
controversy exceeds $75,000.00, pursuant to 28 U.S.C. § 1332.

        3.      Venue in the Eastern District of New York is appropriate, in that it is a judicial
district in which Defendants are subject to the court's personal jurisdiction with respect to this
action, pursuant to 28 U.S.C. §1391(b)(3).

## PRELIMINARY STATEMENT

4.     The Plaintiffs herein, SEAN MORELAND, JAMES FRANCISCHELLI, WALTER TOMON, MICHAEL CAPERS, MARCOS RODRIGUEZ, REGINALD DUGUE and MICHAEL QUICK, are current and former inmates in the New York State Department of Corrections and Community Supervision ("DOCCS") system who were unjustly punished for false positive drug test results in 2019.

5.     Defendant MICROGENICS CORPORATION ("MICROGENICS"), doing business as Thermo Fisher Scientific ("THERMO FISHER"), is the company with which DOCCS contracted to provide, install, maintain, and train DOCCS employees in the use of urinalysis analyzers employed to conduct drug testing at most DOCCS facilities.

6.     Defendant MICROGENICS was required to ensure that the urinalysis analyzers were used in accordance with applicable standards and produced accurate results. Due to its negligent failure to fulfill this basic responsibility, the Plaintiffs herein, as well as thousands of individuals incarcerated in New York State prisons received positive drug test results in 2019 even though they did not ingest any proscribed substance.

7.     When it entered into its contract with DOCCS, Defendants MICROGENICS knew that DOCCS would use positive drug tests to discipline individuals in DOCCS's custody, which is precisely what DOCCS did. Relying upon false positive results generated by Defendant MICROGENICS's urinalysis analyzers, DOCCS charged and severely punished the Plaintiffs herein, as well as thousands of other individuals, for drug use that never took place.

8.     The punishments DOCCS meted out for false positive results were devastating to the Plaintiffs herein, who had committed no offense and who were in fact bewildered by the false accusations.

9.      Said punishments included, but were not limited to, weeks or months in solitary confinement or keeplock, lost privileges (such as packages, commissary, phone use, recreation and school attendance), denial of visitation, and rescission of open parole or conditional release dates. In some cases, individuals were held in prison months beyond their release dates as a direct result of false positive drug tests.

10.     Defendants MICROGENICS and THERMO FISHER are liable to the Plaintiffs who received false positive test results due to their negligent failure to ensure that their drug testing devices and assays were used in accordance with applicable standards and produced reliable test results.

## THE PARTIES

11.     At the pertinent times hereinafter mentioned, Plaintiff SEAN MORELAND was an inmate incarcerated at Gouverneur Correctional Facility, subject to the supervision and authority of the New York State Department of Corrections and Community Supervision (DOCCS).

12.     At the pertinent times hereinafter mentioned, Plaintiff JAMES FRANCISCHELLI was an inmate incarcerated at Greene Correctional Facility, subject to the supervision and authority of the New York State Department of Corrections and Community Supervision (DOCCS).

13.     At the pertinent times hereinafter mentioned, Plaintiff WALTER TOMON was an inmate incarcerated at Wyoming Correctional Facility, subject to the supervision and authority of the New York State Department of Corrections and Community Supervision (DOCCS).

14.     At the pertinent times hereinafter mentioned, Plaintiff MICHAEL CAPERS was an inmate incarcerated at Eastern Correctional Facility, subject to the supervision and authority of the New York State Department of Corrections and Community Supervision (DOCCS).

15.     At the pertinent times hereinafter mentioned, Plaintiff MARCOS RODRIGUEZ

was an inmate incarcerated at Eastern Correctional Facility, subject to the supervision and authority of the New York State Department of Corrections and Community Supervision (DOCCS).

16.    At the pertinent times hereinafter mentioned, Plaintiff REGINALD DUGUE was an inmate incarcerated at Eastern Correctional Facility, subject to the supervision and authority of the New York State Department of Corrections and Community Supervision (DOCCS).

17.    At the pertinent times hereinafter mentioned, Plaintiff MICHAEL QUICK was an inmate incarcerated at Eastern Correctional Facility, subject to the supervision and authority of the New York State Department of Corrections and Community Supervision (DOCCS).

18.    At all times hereinafter mentioned, Defendant MICROGENICS CORPORATION ("MICROGENICS") is a foreign business corporation, existing by virtue of the laws of the State of Delaware, headquartered in Fremont, California, specializing in the development, manufacture, marketing, and sale of products relating to clinical diagnostics. MICROGENICS CORPORATION is a wholly owned corporate subsidiary of Defendant THERMO FISHER SCIENTIFIC, INC. ("THERMO FISHER"). In 2018, Microgenics Corporation contracted with DOCCS to provide Indiko Plus urinalysis analyzers at 52 DOCCS facilities, and to install, maintain, and train DOCCS employees in the use of those machines.

19.    At all times hereinafter mentioned, Defendant THERMO FISHER was and is a foreign business corporation, existing by virtue of the laws of the State of Delaware, headquartered in Waltham, Massachusetts, doing business in the State of New York, marketing itself as the manufacturer of Indiko Plus urinalysis analyzers, as well as the owner of the assays used to conduct drug testing on said analyzers. Defendant THERMO FISHER is responsible for all FDA submissions made regarding Indiko Plus urinalysis analyzers and assays used to conduct drug

testing on said analyzers. Defendant THERMO FISHER is the corporate parent of Defendant MICROGENICS. For purposes of the contract with DOCCS, Microgenics is identified as doing business as Thermo Fisher Scientific.

## STATEMENT OF FACTS

### *Defendants MICROGENICS and THERMO FISHER Contracted with DOCCS to Provide Urinalysis Analyzers*

20.     In May 2018, DOCCS issued Invitation for Bids 2018-06 seeking "reagent rentals of bench top urinalysis analyzer services to be used in its 52 correctional facilities for inmates," with a contract term of September 1, 2018 to August 31, 2023.

21.     Defendants MICROGENICS and THERMO FISHER submitted a bid in response to the Invitation for Bids on behalf of "Microgenics Corporation Part of Thermo Fisher Scientific."

22.     Defendant MICROGENICS is a wholly owned subsidiary of Defendant THERMO FISHER.

23.     The aforesaid bid was submitted on Thermo Scientific letterhead.

24.     The web address identified by Defendant MICROGENICS on the bid was www.thermoscientific.com/diagnostics.

25.     The two individuals identified by Defendant MICROGENICS as "authorized to negotiate on its behalf regarding all matters pertaining to this bid" were sales representatives with email addresses ending with "@thermofisher.com."

26.     In attachments to its bid, Defendant MICROGENICS submitted marketing materials for Defendant THERMO FISHER relating to its urinalysis systems and literature regarding "ThermoFisher Microgenics Reagent information."

27.     On the bid signature page, Defendants identified "Microgenics Corporation" as the

"Legal Business Name of Company Bidding" and stated that Microgenics was "D/B/A – Doing Business As" "Thermo Fisher Scientific."

28.     In September 2018, DOCCS entered into a five-year contract, #CC161458, with Defendants (the "Contract") to provide Indiko Plus urinalysis analyzers and related services for 52 correctional facilities in New York.

29.     The Indiko Plus urinalysis analyzer is an automated benchtop chemistry system that is marketed as a device to conduct urinalysis drug testing. It utilizes Cloned Enzyme Donor Immunoassay (CEDIA) and Diagnostic Reagents, Inc. (DRI) immunoassay methodology.

30.     Defendant THERMO FISHER is the manufacturer of the Indiko Plus urinalysis analyzer and the assays used in connection with that analyzer. It is responsible for the FDA submissions relating to both the machine and assays.

31.     The Indiko Plus urinalysis analyzer is sold and distributed by medical distributors across the country, including Defendant MICROGENICS.

32.     The Contract required Defendants to conduct onsite training at all 52 DOCCS facilities and to conduct a mandatory master trainer class so that DOCCS could train and certify new testers. Defendants conducted such trainings and certified that DOCCS employees were proficient to operate Defendants' machines.

33.     The Contract required Defendants to provide support and maintenance for their urinalysis services, including unlimited 24/7 telephone support; preventative maintenance visits; 24-hour response time; repair, replacement, and maintenance of machines; helpdesk operations; user feedback procedures; and warranties, returns, and exchanges.

34.     The Contract required Defendants' employees to testify at disciplinary hearings for incarcerated individuals who received positive drug test results from the Indiko Plus machines.

35.    Defendants testified about the professed reliability of their testing at numerous disciplinary hearings in 2019, even in instances where the tests had actually produced false positive results. DOCCS relied upon the test results and Defendants' supporting testimony when disciplining

incarcerated persons for positive drug tests.

36.    Despite these standards, the Defendants negligently provided products and services to DOCCS knowing that the results generated by the Indiko Plus urinalysis analyzers would be used to discipline incarcerated persons without any confirmatory testing.

37.    The Defendants negligently failed to inform DOCCS of the applicable standards for the Indiko Plus urinalysis analyzers when negotiating the Contract and providing its contracted products and services.

38.    The Contract required that Defendants' products be "substantially uninterrupted or error-free in operation." It further required that Defendants warrant and represent that products delivered under the contract conform to the manufacturer's specifications, performance standards, and documentation.

39.    Both Defendants MICROGENICS and THERMO FISHER were responsible for providing services under the Contract, and both entities negligently provided such services, breaching their duty of care to the Plaintiffs herein, causing them foreseeable harm.

***Defendants failed to comply with applicable standards and their test results were unreliable.***

40.    DOCCS began to use the Indiko Plus urinalysis analyzers provided by Defendant MICROGENICS at DOCCS's facilities in late 2018 or early 2019.

41.    As the entities responsible for providing drug testing services in DOCCS' facilities (including machines, assays, services, training, installation, and maintenance), Defendants owed

incarcerated persons in those facilities, including the Plaintiffs herein, a duty to abide by applicable drug testing standards and to ensure that the testing was accurate and reliable. Defendants breached those duties.

42.    Defendants' standards for the Indiko Plus urinalysis analyzers state that the machines should be used as an initial screen only, and confirmatory testing (such as gas chromatography/mass spectrometry) is required to verify any positive result.

43.    In their 510(k) Premarket Notification to the FDA for the CEDIA Buprenorphine II Assay ("Buprenorphine Assay") Defendants actually stated that: "The assay provides only a preliminary analytical test result. A more specific alternative chemical method *must* [emphasis added] be used to obtain a confirmed analytical result. Gas chromatography/mass spectrometry (GC/MS) or Liquid chromatography/tandem mass spectrometry (LC-MS/MS) is the preferred confirmatory method."

44.    Despite these standards, Defendants negligently provided products and services to DOCCS knowing that the results generated by the Indiko Plus urinalysis analyzers would be used to discipline inmates without any confirmatory testing.

45.    Defendants negligently failed to inform DOCCS of the applicable standards for the Indiko Plus urinalysis analyzers when negotiating the Contract and providing its contracted products and services.

46.    Defendants negligently failed to train DOCCS employees on the applicable standards for the Indiko Plus urinalysis analyzers.

47.    Defendants negligently testified at disciplinary hearings that the results from the Indiko Plus urinalysis analyzers could be relied upon as a basis for disciplining incarcerated individuals, even though Defendants knew that the results were only preliminary screens and not

definitive tests.

48.    Defendants negligently failed to ensure that their products and services were used in accordance with applicable standards even though they had full control over the nature of said use.

49.    Defendants knew that positive drug screen results from the Indiko Plus urinalysis analyzers would be used to discipline individuals in DOCCS' custody, including the Plaintiffs herein, without verification by an outside laboratory using gas chromatography/mass spectrometry or any other verification method, and they took no measures to prevent such discipline from being imposed based only upon a screening test. On the contrary, Defendants' employees supported and endorsed such use.

50.    Nothing in the Contract required DOCCS to verify Defendants' drug test results through an outside laboratory using gas chromatography or any other method prior to disciplining incarcerated persons, including the Plaintiffs herein.

51.    Defendants failed to determine whether their testing had the same level of accuracy as the EMIT tests, which had been used previously by DOCCS for several decades. Nevertheless, the  Defendants represented that the buprenorphine assay performed with the Indiko Plus analyzer, when used the same way as the older EMIT testing, was just as accurate (*i.e.*, 98%).

52.    Not only did Defendants negligently fail to abide by applicable standards, but they were also negligent in failing to ensure that the Indiko Plus urinalysis analyzers produced accurate preliminary drug test screens.

53.    Contrary to Defendants' representations that their services would be error-free, they failed to ensure that their machines and assays functioned properly, resulting in widespread cross-reactivity issues that caused thousands of false positive results for Suboxone/buprenorphine, AB

Pinaca, opiates, and THC.

54.     The cross-reactivity issues that ensued were the direct result of Defendants' negligence in their installation, training, and maintenance of the machines and in their provision of reagents.

55.     Further, Defendants continued to testify at disciplinary hearings that their test results were reliable even though they knew or should have known that there were serious reliability concerns, especially given the sheer number of incarcerated persons reported as positive on urinalysis drug testing.

56.     In particular, it should have been apparent that having many incarcerated people, with no history of opiate abuse, testing positive for a drug, Suboxone/buprenorphine, which is rarely taken recreationally, was an aberration and cause for concern.

57.     In fact, buprenorphine is most commonly available as a component of Suboxone, which is a combination of buprenorphine and naloxone. Suboxone is used to deter opiate abuse because buprenorphine, while binding to opioid receptors, has a milder effect than more potent opioids, decreasing cravings for other opioids. Naloxone actually blocks opioid receptors, further blunting the euphoria or "high" obtained from opioids.

58.     Ultimately, DOCCS determined that the positive results generated by Indiko Plus urinalysis analyzers were so unreliable that it reversed the disciplinary decisions for every positive result for Suboxone/buprenorphine, including those of the Plaintiffs herein, AB Pinaca, opiates, and THC generated by the Indiko Plus analyzers in 2019.

59.     DOCCS's decision to overturn every positive result for these substances indicates the magnitude of the issue. The problem with Defendants' testing was so widespread that not a single positive finding was reliable enough to uphold the discipline meted out to the Plaintiffs

herein.

60.    In November 2019, DOCCS changed its policy by now requiring a confirmatory test using gas chromatography/mass spectrometry, or similar method, before instituting discipline.

61.    In January 2020, DOCCS terminated its contract with Defendants for cause, based upon Defendants' failure to comply with the terms and conditions of the Contract.

62.    DOCCS officials and the New York State Inspector General are both investigating Defendants, given the rampant and voluminous number of unreliable and false positive test results.

63.    On February 28, 2020, DOCCS sued Defendants in New York State Supreme Court, County of Albany, alleging that Defendants' equipment, products, procedures, and services were inadequate and deficient, failed to operate appropriately for their intended use, and produced false positive test results.

64.    The natural and foreseeable consequence of Defendants' negligent failure to ensure that its products and services complied with applicable standards and produced accurate results was that thousands of incarcerated persons, including the Plaintiffs herein, were punished for false and unreliable positive drug tests.

65.    The punishments DOCCS imposed upon the Plaintiffs herein included, but were not limited to, weeks or months in solitary confinement; weeks or months in keeplock (where the wrongfully accused individuals were not permitted to leave their cell or dorm area); loss of privileges such as recreation, commissary, mail, packages, and phone calls; loss of visitation; loss of good time credit; loss of merit time; loss of an open conditional release date; loss of a parole open date; loss of a preferred work assignment; denial of parole release; denial of conditional release; denial of participation in the Family Reunion Program; removal from a necessary or desired program, such as an education or treatment program; and transfer from a preferred facility

or hub. In some cases, individuals who lost good time credit or who had open parole or conditional release dates rescinded were held in prison months beyond their release dates as a direct consequence of the faulty test results.

***Plaintiffs herein tested positive for Suboxone/buprenorphine despite not using it, were unjustly charged and were sentenced.***

66.    Plaintiff SEAN MORELAND was an inmate incarcerated at Gouverneur Correctional Facility when he was required to provide a urine specimen for drug testing on or about May 23, 2019. On or about May 28, 2019, the specimen was analyzed using the Indiko Plus analyzer, and returned positive results for buprenorphine on two analyses, resulting in the issuance of an Inmate Misbehavior Report. A disciplinary hearing was held on or about June 3, 2019, at which hearing he was found guilty of violating Rule 113.24 (drug use) solely based upon the above urine drug testing results, to the exclusion of all other evidence. He was sentenced to 90 days keeplock and 90 days loss of packages, commissary and phone privileges. On or about September 14, 2019, his guilty verdict was reversed and the incident was expunged from his record, due to "cross-reactivity" issues affecting his false positive drug test.

67.    Plaintiff JAMES FRANCISCHELLI was an inmate incarcerated at Greene Correctional Facility when he was required to provide a urine specimen for drug testing on or about February 13, 2019. On or about February 13, 2019, the specimen was analyzed using the Indiko Plus analyzer, and returned positive results for buprenorphine on two analyses, resulting in the issuance of an Inmate Misbehavior Report. A disciplinary hearing was held on or about February 20, 2019, at which hearing he was found guilty of violating Rule 113.24 (drug use) solely based upon the above urine drug testing results, to the exclusion of all other evidence. He was sentenced to 180 days in the Special Housing Unit (SHU) and 180 days loss of packages,

commissary and phone privileges. On or about September 13, 2019, his guilty verdict was reversed and the incident was expunged from his record, due to "cross-reactivity" issues affecting his false positive drug test.

68.    Plaintiff WALTER TOMON was an inmate incarcerated at Wyoming Correctional Facility when he was required to provide a urine specimen for drug testing on or about March 8, 2019. On or about March 11, 2019, the specimen was analyzed using the Indiko Plus analyzer, and returned positive results for buprenorphine on two analyses, resulting in the issuance of an Inmate Misbehavior Report. A disciplinary hearing was held on or about March 22, 2019, at which hearing he was found guilty of violating Rule 113.24 (drug use) solely based upon the above urine drug testing results, to the exclusion of all other evidence. He was sentenced to 90 days in the Special Housing Unit (SHU) and 90 days loss of packages, commissary and phone privileges and visitation. On or about September 14, 2019, his guilty verdict was reversed and the incident was expunged from his record, due to "cross-reactivity" issues affecting his false positive drug test.

69.    Plaintiff MICHAEL CAPERS was an inmate incarcerated at Eastern Correctional Facility when he was required to provide a urine specimen for drug testing on or about April 15, 2019. On or about April 22, 2019, the specimen was analyzed using the Indiko Plus analyzer, and returned positive results for buprenorphine on two analyses, resulting in the issuance of an Inmate Misbehavior Report. A disciplinary hearing was held on or about May 2 and 10, 2019, at which hearing he was found guilty of violating Rule 113.24 (drug use) solely based upon the above urine drug testing results, to the exclusion of all other evidence. He was sentenced to 30 days keeplock and 30 days loss of packages, commissary, recreation and phone privileges. On or about September 16, 2019, his guilty verdict was reversed and the incident was expunged from his record, due to "cross-reactivity" issues affecting his false positive drug test.

70.     Plaintiff MARCOS RODRIGUEZ was an inmate incarcerated at Eastern Correctional Facility when he was required to provide a urine specimen for drug testing on or about July 8, 2019. On or about July 11, 2019, the specimen was analyzed using the Indiko Plus analyzer, and returned positive results for buprenorphine on two analyses, resulting in the issuance of an Inmate Misbehavior Report. A disciplinary hearing was held on or about July 23, 2019, at which hearing he was found guilty of violating Rule 113.24 (drug use) solely based upon the above urine drug testing results, to the exclusion of all other evidence. He was sentenced to 30 days keeplock and 45 days loss of packages, commissary and phone privileges. On or about September 13, 2019, his guilty verdict was reversed and the incident was expunged from his record, due to "cross-reactivity" issues affecting his false positive drug test.

71.     Plaintiff REGINALD DUGUE was an inmate incarcerated at Eastern Correctional Facility when he was required to provide a urine specimen for drug testing on or about May 9, 2019. On or about May 13, 2019, the specimen was analyzed using the Indiko Plus analyzer, and returned positive results for buprenorphine on two analyses, resulting in the issuance of an Inmate Misbehavior Report. A disciplinary hearing was held on or about May 27, 2019, at which hearing he was found guilty of violating Rule 113.24 (drug use) solely based upon the above urine drug testing results, to the exclusion of all other evidence. He was sentenced to 30 days keeplock and 30 days loss of packages, commissary, recreation and phone privileges (30 days loss of recreation was eliminated). On or about October 11, 2019, his guilty verdict was reversed and the incident was expunged from his record, due to "cross-reactivity" issues affecting his false positive drug test.

72.     Plaintiff MICHAEL QUICK was an inmate incarcerated at Coxsackie Correctional Facility when he was required to provide a urine specimen for drug testing in or about June 2019.

In or about June 2019, the specimen was analyzed using the Indiko Plus analyzer, and returned positive results for buprenorphine on two analyses, resulting in the issuance of an Inmate Misbehavior Report. A disciplinary hearing was held on or about June 27, 2019, at which hearing he was found guilty of violating Rule 113.24 (drug use) solely based upon the above urine drug testing results, to the exclusion of all other evidence. He was sentenced to special housing and loss of certain privileges. On or about September 15, 2019, his guilty verdict was reversed and the incident was expunged from his record, due to "cross-reactivity" issues affecting his false positive drug test.

73.    In the case of each listed Plaintiff, Defendants, their agents, contractors, servants and/or employees, were negligent in their ownership, operation, installation, maintenance, servicing, supervision, direction, and control of the drug testing equipment, , immunoassay, and process used to test the Claimant, in violation of 7 NYCRR §1020.4(f)(1)(iii).

74.    In the case of each listed Plaintiff, Defendants were negligent in their training of DOCCS personnel to operate the drug testing equipment, in violation of 7 NYCRR §1020.4(f)(1)(iii).

75.    In the case of each listed Plaintiff, Defendants failed to assure that DOCCS had properly trained personnel performing and supervising said drug tests, in violation of 7 NYCRR §1020.4(f)(1)(iii).

76.    In the case of each listed Plaintiff, Defendants failed to train and instruct DOCCS personnel to confirm the preliminary screening results obtained from the Indiko Plus analyzer with a more definitive test, in keeping with industry standards and practices, in violation of 7 NYCRR §§1020.4(f)(1)(iv) and 1020.7.

77.    In the case of each listed Plaintiff, Defendants failed to train and instruct DOCCS

personnel to request details of the inmate-donor's declared medications, in violation of 7 NYCRR
§1020.4(d)(2).

78.      In the case of each listed Plaintiff, Defendants failed to train and instruct DOCCS
personnel to keep immunoassays properly labeled, separated, and free from cross-contamination
and cross-reactivity, in violation of 7 NYCRR §1020.4(d)(2) and (3).

79.      In the case of each listed Plaintiff, Defendants failed to train and instruct DOCCS
personnel to follow proper procedures and protocols for urinalysis testing, in violation of 7
NYCRR §1020.4.

80.      In the case of each listed Plaintiff, Defendants failed to train and instruct DOCCS
personnel as to the proper handling of urine samples, testing materials, and immunoassays, in
violation of 7 NYCRR §1020.4(d)(2) and (3).

81.      In the case of each listed Plaintiff, Defendants failed to properly and
conscientiously train and supervise the conduct of DOCCS personnel after their employment, in
violation of 7 NYCRR §1020.4(f)(1)(iii).

82.      As a result of the unfounded drug charges, due to the aforesaid negligence of the
Defendants herein, each of the Plaintiffs herein was subjected to a disciplinary hearing at which
they were found guilty of drug use, resulting in serious sanctions and punishments.

**FIRST CAUSE OF ACTION ON BEHALF OF ALL PLAINTIFFS FOR NEGLIGENCE**

83.      The Plaintiffs repeat, reallege and reiterate each and every allegation set forth in
paragraphs "1" to "82" above as if set forth in full herein.

84.      By virtue of the above, Defendants MICROGENICS and THERMO FISHER owed
a duty to the Plaintiffs to provide DOCCS with Indiko Plus Analyzers and related products and
services in such a manner as to produce accurate urinalysis drug testing results.

85.    By virtue of the above, Defendants MICROGENICS and THERMO FISHER owed a duty to the Plaintiffs to ensure that the Indiko Plus urinalysis analyzers were used in accordance with applicable standards and produced accurate and reliable test results.

86.    By virtue of the above, Defendants MICROGENICS and THERMO FISHER owed a duty to the Plaintiffs as reasonably foreseeable, intended, direct third-party beneficiaries of the contract between Defendant MICROGENICS and DOCCS to provide DOCCS with Indiko Plus Analyzers and related products and services in such a manner as to produce accurate urinalysis drug testing results.

87.    Defendants breached their duty to Plaintiffs by failing to ensure that the Indiko Plus urinalysis analyzers yielded accurate and reliable test results; entering a contract for use of the Indiko Plus urinalysis analyzers that was inconsistent with applicable standards; failing to train DOCCS employees on applicable standards for using the Indiko Plus urinalysis analyzers; and testifying at disciplinary hearings that the results generated by Indiko Plus urinalysis analyzers could be relied upon for discipline, when Defendants knew that the results were a preliminary screen only.

88.    Defendants knew that DOCCS was relying upon test results from the Indiko Plus urinalysis analyzers to discipline individuals in its custody, and it was reasonably foreseeable to Defendants that their failure to ensure accurate and reliable test results and that the Indiko Plus urinalysis analyzers were used in a manner consistent with applicable standards would result in unjust discipline of those individuals and the naturally foreseeable adverse consequences of such discipline.

89.    As a result of Defendants' negligent failure to ensure that the Indiko Plus urinalysis analyzers yielded accurate and reliable results and were used in accordance with applicable

standards, Plaintiffs were subjected to serious discipline, including, but not limited to, solitary confinement, keeplock, being held beyond their scheduled release date, and loss of privileges.

90.     Because of Defendants' unlawful conduct, Plaintiffs have suffered pain and suffering, mental and emotional distress, humiliation, embarrassment, loss of liberty, and monetary damages.

91.     At all times mentioned, the Plaintiffs were free from culpable conduct and did not contribute to the happening of the occurrence by any act or omission on their parts.

**SECOND CAUSE OF ACTION ON BEHALF OF ALL PLAINTIFFS FOR
42 U.S.C. § 1983 DUE PROCESS VIOLATIONS**

92.     The Plaintiffs repeat, reallege and reiterate each and every allegation set forth in paragraphs "1" to "91" above as if set forth in full herein.

93.     The Defendants contracted with the State of New York to perform several functions traditionally performed by the State, including choosing which tests to employ to test for illicit drug use, training DOCCS employees to perform the tests, and testifying (and otherwise providing information) regarding how accurate the tests are.

94.     It was the explicit policy of the Defendants to affirmatively represent, both to DOCCS and in disciplinary hearings, that two Buprenorphine Assay tests using the Indiko Plus Analyzer were as accurate as two EMIT tests, the method DOCCS had used for decades prior.

95.     Further, it was the explicit policy of the Defendants to affirmatively represent, both to DOCCS and in disciplinary hearings, that the two Buprenorphine Assay tests using the Indiko Plus Analyzer were sufficient and no other confirmatory testing was needed.

96.     Based upon the Defendants' representations to DOCCS, the two Buprenorphine Assay tests using the Indiko Plus Analyzer were used to discipline incarcerated persons, including

the Plaintiffs herein.

97.    These representations were false. In fact, in their applications to the FDA, Thermo Fischer and Microgenics stated that the Buprenorphine Assay results must be confirmed using gas chromatography/mass spectrometry.

98.    These false statements thus violated the Plaintiffs' right to due process.

99.    The Defendants are therefore liable for Plaintiffs' injuries under 42 U.S.C. § 1983, for which Plaintiffs seek redress of the deprivation, under color of state law, of rights guaranteed by the United States Constitution. including but not limited to loss of liberty, emotional and physical pain and suffering caused by the extended incarceration, and humiliation at being falsely accused of being an illegal drug user.

**WHEREFORE**, Plaintiffs SEAN MORELAND, JAMES FRANCISCHELLI, WALTER TOMON, MICHAEL CAPERS, MARCOS RODRIGUEZ, REGINALD DUGUE and MICHAEL QUICK demand judgment against the Defendants, and each of them, in amounts which exceed the jurisdictional limits of all lower Courts that might otherwise have jurisdiction over this matter, on the First and Second Causes of Action alleged herein, in an amount to be determined by the trier of fact but in no event less than $10,000,000.00, together with punitive damages, costs, attorneys fees, interest and disbursements of this action, and such other relief as a court would find fair and just.

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated: Brooklyn, New York
       February 11, 2021

                              Respectfully submitted,

                              HELD & HINES, LLP
                              2004 Ralph Avenue
                              Brooklyn, New York 11234
                              (718) 531-9700
                              phines@heldhines.com

                              *Attorneys for Plaintiffs*


                              */s/ Philip Hines*_____
                              By: Philip M. Hines, Esq.